Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

FILED BY _il_ D.C.

~~OCT 0 0 2020~~

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

# UNITED STATES DISTRICT COURT

for the

SOUTHERN District of FLORIDA

Division

Case No. _____

(to be filled in by the Clerk's Office)

)
)
)
)
)
)
)
)
)
)
)
)
)
)

STEPHEN MARKS, an individual
_____
Plaintiff(s)
*(Write the full name of each plaintiff who is filing this complaint.
If the names of all the plaintiffs cannot fit in the space above,
please write "see attached" in the space and attach an additional
page with the full list of names.)*

-v-

SARGENT MICHAEL CATALANO, individually
_____
Defendant(s)
*(Write the full name of each defendant who is being sued. If the
names of all the defendants cannot fit in the space above, please
write "see attached" in the space and attach an additional page
with the full list of names. Do not include addresses here.)*

Jury Trial: *(check one)*  ☒ Yes  ☐ No

## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

(Non–Prisoner Complaint)

### NOTICE

Federal Rules of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

Except as noted in this form, plaintiff need not send exhibits, affidavits, grievance or witness statements, or any other materials to the Clerk's Office with this complaint.

In order for your complaint to be filed, it must be accompanied by the filing fee or an application to proceed in forma pauperis.

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

## I.    The Parties to This Complaint

### A.    The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

| | |
|---|---|
| Name | Stephen Marks |
| Address | 9587 Weldon Circle, B104 |
| | Tamarac — FL — 33321 |
| | *City* — *State* — *Zip Code* |
| County | Broward |
| Telephone Number | 305-900-7747 |
| E-Mail Address | stephenqmarks@gmail.com |

### B.    The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation.  For an individual defendant, include the person's job or title (if known) and check whether you are bringing this complaint against them in their individual capacity or official capacity, or both.  Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | Sargent Michael Catalano |
| Job or Title *(if known)* | Sargent |
| Address | 2601 Broward Boulevard,  Broward's Sheriff Office |
| | Ft. Lauderdale — FL — 33321 |
| | *City* — *State* — *Zip Code* |
| County | Broward |
| Telephone Number | 954-765-4321 |
| E-Mail Address *(if known)* | |

☐ Individual capacity    ☐ Official capacity

Defendant No. 2

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Address | |
| | |
| | *City* — *State* — *Zip Code* |
| County | |
| Telephone Number | |
| E-Mail Address *(if known)* | |

☐ Individual capacity    ☐ Official capacity

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non-Prisoner)

Defendant No. 3
    Name                          _____
    Job or Title *(if known)*      _____
    Address                      _____
                                      *City*         *State*         *Zip Code*
    County                      _____
    Telephone Number       _____
    E-Mail Address *(if known)*   _____

    ☐ Individual capacity     ☐ Official capacity

Defendant No. 4
    Name                          _____
    Job or Title *(if known)*      _____
    Address                      _____
                                        *City*         *State*         *Zip Code*
    County                      _____
    Telephone Number       _____
    E-Mail Address *(if known)*   _____

    ☐ Individual capacity     ☐ Official capacity

**II.**    **Basis for Jurisdiction**

Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)*, you may sue federal officials for the violation of certain constitutional rights.

    A.     Are you bringing suit against *(check all that apply):*

        ☐ Federal officials (a *Bivens* claim)

        ☒ State or local officials (a § 1983 claim)

    B.     Section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." 42 U.S.C. § 1983. If you are suing under section 1983, what federal constitutional or statutory right(s) do you claim is/are being violated by state or local officials?

        SEE ATTACHED

    C.     Plaintiffs suing under *Bivens* may only recover for the violation of certain constitutional rights. If you are suing under *Bivens*, what constitutional right(s) do you claim is/are being violated by federal officials?

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

D.      Section 1983 allows defendants to be found liable only when they have acted "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983.  If you are suing under section 1983, explain how each defendant acted under color of state or local law.  If you are suing under *Bivens*, explain how each defendant acted under color of federal law.  Attach additional pages if needed.

SEE ATTACHED

## III.   Statement of Claim

State as briefly as possible the facts of your case.  Describe how each defendant was personally involved in the alleged wrongful action, along with the dates and locations of all relevant events.  You may wish to include further details such as the names of other persons involved in the events giving rise to your claims.  Do not cite any cases or statutes.  If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph.  Attach additional pages if needed.

A.      Where did the events giving rise to your claim(s) occur?

9587 Weldon Circle, B104, Tamarac, FL 33321

B.      What date and approximate time did the events giving rise to your claim(s) occur?

August 30, 2017,    12:00 Noon to 2:00PM

C.      What are the facts underlying your claim(s)?  *(For example:  What happened to you?  Who did what? Was anyone else involved?  Who else saw what happened?)*

SEE ATTACHED

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non-Prisoner)

**IV.**    **Injuries**

If you sustained injuries related to the events alleged above, describe your injuries and state what medical treatment, if any, you required and did or did not receive.

PUNITIVE DAMAGES, PAIN AND SUFFERING

SEE ATTACHED

**V.**    **Relief**

State briefly what you want the court to do for you. Make no legal arguments. Do not cite any cases or statutes. If requesting money damages, include the amounts of any actual damages and/or punitive damages claimed for the acts alleged.  Explain the basis for these claims.

SARGENT MICHAEL CATALANO:  $200,000.00

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

## VI.   Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.      For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:      September 29, 2020

Signature of Plaintiff       *Stephen Marks* / Pro Se

Printed Name of Plaintiff    **Stephen Marks / Pro Se**

### B.      For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Address

|  | City | State | Zip Code |
|---|---|---|---|

Telephone Number

E-mail Address

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF FLORIDA

## CASE NO.

STEPHEN MARKS, an individual

--------------------------------------------------------/ )

PLAINTIFF )

)

V )

)

SARGENT MICHAEL CATALANO, individually )

--------------------------------------------------------/ )

DEFENDANT

## I.   CIVIL RIGHTS COMPLAINT PURSUANT TO 42 U.S.C

The Plaintiff, STEPHEN MARKS (hereby referred to as "STEPHEN"), hereby sues the Defendant, SARGENT MICHAEL CATALANO of the Broward Sheriff's Office (BSO) hereby referred to as "SARGENT CATALANO" individually.

Plaintiff Stephen Marks will prove his allegations from legal documents (see Exhibits 1-6 below after the complaint) and five Broward Sheriff's Office (BSO) police video webcams (see link below) that defendant Sargent Catalano was guilty of denying Stephen Marks' civil rights under U.S.C 1983, including *"deprivation of Plaintiff's civil rights, privileges, or immunities secured by the Constitution and federal laws,"* and also acted *"under color of any statute, ordinance, regulation, custom or usage of any state or Territory or the District of Columbia"* and also acted *"under color of state and local law."*

All the police webcam videos can be viewed at:
https://www.youtube.com/channel/UCLHTn-wj-wqODRyD4s0COoA

## II. BASIS FOR JURISDICTION

Plaintiff Stephen Marks lives in Broward County and Defendant Sargent Michael Catalano (of the Broward Sheriff's Office) were both at the scene described below at 9587 Weldon Circle, Apartment B104, Tamarac FL, also in Broward County on the date in question, August 30, 1017 when STEPHEN'S father Hyman Marks died.

## III. FACTUAL ALLEGATIONS

1. In 2017, Hyman and his wife Helen Marks both signed separate "Durable Power of Attorneys" (POA, see Exhibits 1&2) giving equal Power of Attorney to their sons STEPHEN and LAWRENCE for health care decisions over Hyman and Helen.

2. Hyman also signed a "Designation of Health Care Surrogate" (see Exhibit 3), giving STEPHEN and LAWRENCE equal rights over health care decisions should Hyman become "unable or incapacitated to provide informed consent."

3. Finally, Hyman and Helen signed the "Hyman and Helen Revocable Trust" (see Exhibit 4) again making STEPHEN and LAWRENCE equal Trustees to control Hyman's assets upon Hyman's death, which included the condo in Tamarac they were living in.

4. Before November 2013, STEPHEN and his parents Hyman and Helen lived in Tamarac Florida, with Hyman and Helen living at 9587 Weldon Circle, Apartment B104, while STEPHEN lived very close by in Tamarac.

5. After November 2013, STEHEN joined Hyman and Helen Marks living in their Tamarac condo full-time because Helen became afflicted with Alzheimer's and dementia.  STEPHEN lived there to be close to his parents until February 2015, when STEPHEN had to move out of the condo because the he has cold-induced asthma, and the air conditioning in the condo gave him trouble breathing.  STEPHEN then moved very close by (still in Tamarac) and was able to still see his parents almost every day.

6. On the date in question when Hyman died (August 30[th, 2017]), STEPHEN came to the front door of his parents' condo wanting to see his father's body to say goodbye and to make sure that his mother Helen (afflicted with Alzheimer's) was okay. When STEPHEN arrived, Vitas Health Care Nurse Ana Morales (the nurse on duty that day) was inside

2

the condo with other Vitas employees, along with Nanny Dorothy Hylton of Senior Nannies who lived with both Hyman and Helen Marks 24/7.

7. The Vitas employees refused to allow STEPHEN inside the property, claiming incorrectly that STEPHEN was *not* on the Powers or Attorney for his parents, nor the family trust, nor on any legal documents.

8. All of this was untrue (as stated above from Exhibits 1-4) that STEPHEN was indeed on all the documents with his brother Lawrence as well as on their family trust regarding the condo, therefore giving STEPHEN the legal right to go into the condo to see his parents after Hyman's death.

9. When STEPHEN realized that he was not going to be allowed into the condo, he called the Broward Sheriff's Office (BSO), asking that the send a police officer over to force the Vitas employees to allow STEPHEN into the property to see his parents.

10. Officer Roberto Aspuru and then SARGENT MICHAEL CATALANO came to the scene.  But instead of trying to get the Vitas employees to allow STEPHEN onto the property, SARGENT CATALANO threatened STEPHEN with arrest if he didn't leave condo complex, believing Vitas and not STEPHEN.

11. SARGENT CATALANO acted with malice and flagrant police misconduct, including committing the serious crime of "Tampering with Evidence" a Class 3 felony, which is described in detail below.

12. As can be seen on Police Webcam Video 4 of 5 at 1:20, SARGENT CATALANO asked Nurse Morales whether or not STEPHEN was on the Power of Attorney or Trust documents.

13. As seen on that video, NURSE MORALES told SARGENT CATALANO that STEPHEN was *not* on the legal documents as she said, *"No he is not, his brother is"* (which was incorrect).

14. Before speaking inside the condo to Nurse Morales (as seen on Police Webcam Videos 3 &4) SARGENT CATALANO appeared to be acting in good faith with STEPHEN, telling STEPHEN that he would be let in if it could be shown to SARGENT CATALANO that STEPHEN was indeed on the legal documents.  STEPHEN even complimented SARGENT CATALANO for being more professional than Officer Aspuru and having a better demeanor.  But that changed quickly after SARGENT CATALANO went into the condo.

15. When SARGENT CATALANO went inside the property looking for paperwork to see if STEPHEN was or was not on the legal documents, he did find a copy of the Family Trust (see Police Webcam Video 4 of 5, from 11:00 to 12:35) as well as Exhibit 5, a still shot from that part of the video showing SARGENT CATALANO looking directly at the specific page of the Family Trust showing STEPHEN'S name in huge letters as becoming a trustee upon his father's Hyman's death.

16. This was not only the exact same image seen in Exhibit 4, page 5 (mentioned above) showing STEPHEN on the Trust, it was also physical proof that STEPHEN was telling the truth about being on the Trust and allowed on the property, and that Nurse Morales, the other Vitas employees, and Nanny Dorothy Hylton were wrong in their assertion that STEPHEN was not allowed onto the property.

17. As seen in the video SARGENT CATALANO looked at the documents with STEPHEN'S name on it for a long time.  SARGENT CATALANO then folded the pages at the moment he was looking at that document, causing him to only be looking at the very top of the page, again for a long time (see again Exhibit 5) where he clearly would have had to have seen STEPHEN'S name in huge letters where it said he became a Trustee on the property upon his father's death.

18. However, instead of allowing Plaintiff onto the property, the video will show that SARGENT CATALANAO instead engaged in a flagrant corrupt cover-up and obstruction, choosing to ignore what was written on the Trust. On the of Police Webcam Video 4 of 5 at 12:35, SARGENT CATALANO hid the Trust under the other documents and said, *"I can't understand this."*

19. He then proceeded to go outside (see Police Video Webcam 5 of 5 at 1:50 to the end of the video) where he evicted STEPHEN off the property by telling him multiple lies, including how he could not find the Trust while viciously threatening STEPHEN with arrest if he did not vacate the premises.

20.. After finding and reading the Trust, SARGENT CATALANO became more hostile towards STEPHEN as he told STEPHEN (see Police Video Webcam 5 of 5 at 1:50): *"The bottom line here...I don't know if you're on (the Trust) or not... I can't find paperwork... I'm gonna to tell you to leave."* This was a flagrant lie since Catalano did find the paperwork and did know that STEPHEN was indeed on the Trust.

21. This also totally contradicted what CATALANO said to STEPHEN multiple times earlier in a very friendly way that he would allow STEPHEN onto the property if he could find any proof that STEPHEN was indeed on the legal documents.

25. However, after SARGENT CATALANO covered up the fact that STEPHPEN was on the legal document, STEPHEN (not knowing that SARGENT CATALANO was lying and covering up the fact that he had seen STEPHEN's name on legal document). STEPHEN had his attorney Larry Blacke on the phone to also tell SARGENT CATALANO that STEPHEN was indeed on the POAs and a Trustee on the condo, SARGENT CATLANO said (see Police Webcam Video 5 of 5 at 2:35) *"I'm not gonna talk to anybody...I'm over. I'm asking you as a gentleman. I've done my part. This is where the law comes in."*

26. SARGENT CATALANO tampering with and hiding the evidence that STEPHEN was telling the truth in this dispute between STEPHEN and Vitas was a serious crime; a Class 3 felony. A police officer deliberately tampering or hiding evidence that would help a party in a dispute is no different than an officer planting phony evidence to hurt one of the parities.

27. Even worse, CATALANO used yet another flagrant lie as to why he had to remove STEPHEN from the property even if STEPHEN *was* indeed on the legal documents, telling STEPHEN (see Police Video Webcam 5 of 5 at 2:10) that if he didn't leave the property, all the workers inside would leave the property, leaving STEPHEN'S mother alone.

28. This was a lie since SARGENT CATALANO knew full well that Nanny Hylton was there 24/7 and would *never* leave Helen Marks unattended. SARGENT CATALANO knew this was a lie since he had twice been told by the employees inside (see Police Webcam Video 3 of 5 at 13:24, and Police Webcam Video 4 of 5 at 1:05) that Nanny HYYLTON would be staying with Helen 24/7.

29. Finally, even if SARGENT CATALANO did have the legal right to keep STEPHEN off the premises for a legitimate reason such as wanting to de-escalate the problem, and had been honest to STEPHEN and said to him *"I saw that you are on the legal document but I'm still not letting you inside'*, STEPHEN would have respected that. But that was not the case here.

30. Despite STEPHEN being on all the legal documents, his reason for not allowing STEPHEN onto the property (that he didn't want to leave STEPHEN'S mother alone) was another provable clear-cut lie seen on the videotape, just like his denying that he knew STEPHEN was on the legal documents after he tampered with the evidence.

31. More on the videos concerning SARGENT CATALANO'S malicious Behavior towards STEPHEN: See Police Webcam Video 3 of 5 at 2:00, where SARGENT CATALANO told STEPHEN that Officer Aspuru told him that STEPHEN had *"threatened"* people with a baseball bat, a vicious lie told as another corrupt pretext to throw STEPHEN off the

property. In the same video at 2:10 SARGENT CATALANO also claimed that his "dispatcher" heard STEPHEN making threats, another lie. When looking through all five police videos, it is clearly shown that STEPHEN never threatened anyone.

32. On Police Webcam 5 of 5, at 2:35 (as mentioned above) SARGENT CATALANO told STEPHEN *"This is where the law comes in. You're impeding an investigation.* SARGENT CATALANO saying to STEPHEN *"This is where the law comes in"* is especially despicable since SARGENT Catalano was corruptly *abusing* the law against STEPHEN, not *enforcing* the law.

33. Saying that STEPHEN was "impeding an investigation) was also a lie. The police were called twice to come to the premises by STEPHEN to try to get help entering the condo. The police never came for any "investigation" since there was no investigation (police are not called to investigate deaths where there are health care workers on the premises with the deceased, unless they had reason to believe there was a criminal act committed).

34. Also, in every second of all the police videos, there is not one second of the police investigating Hyman's death. STEPHEN could not have been impeding an investigation since *was no* investigation by the police, since they were called there by STEPHEN to let him into the condo. More of the same at 3:30 of Police Webcam Video 5 of 5, with SARGENT CATALANO saying to STEPHEN: *"Whether you're on the Trust or not, they don't want you in there."*

35. Later on Police Video Webcam 5 of 5, at *4:40,* SARGENT CATALANO said to STEPHEN*: "It doesn't matter. I'm done with you. You may be on it (the Trust) or maybe not. You should leave. You're not going inside... If all the nurses leave, you'll have no one to care for your mom* (which explained above was a lie (seen in Police Video Webcam 3 and 4) where SARGENT CATALANO was 100% aware that STEPHEN'S mom would never be left alone.

36. SARGENT CATALANO (see Police Webcam Video 5 of 5, at 5:10), also said to STEPHEN: *"I'm done. Don't talk to me. Goodbye"*

37. It must be noted here that SARGENT CATALANO was saying all these things to STEPHEN *after* knowing for fact that STEPHEN was in fact telling the truth and was on all the legal documents.

38. These actions made SARGENT CATALANO guilty denying Stephen Marks' civil rights under U.S.C 1983, including *"deprivation of Plaintiff's civil rights, privileges, or immunities secured by the Constitution and federal laws,"* and also acted *"under color of*

*any statute, ordinance, regulation, custom or usage of any state or Territory or the District of Columbia"* and also acted *"under color of state and local law."*

39. In addition to all this, STEPHEN and his brother LAWRENCE had full authority over the Vitas employees and Nanny Hylton. STEPHEN even had every right at this point fire all of them but SARGENT CATALANO turned the situation upside down by giving all the authority to the employees, and none to STEPHEN, who was in effect their employer.

40. Even before seeing the legal documents, SARGENT CATALNAO could have easily gotten to the bottom of the dispute between STPEHEN and Vitas by simply calling Vitas' local office, where they would have told the officers that STEPHEN was indeed on the legal documents and had the legal right to go into the condo.

41. Regarding the charges that SARGENT CATALANO kept saying to STEPHEN that Nurse Morales claimed that STEPHEN was "threatening" to them, it must be noted that those inside the condo also included one, and then two young muscular police officers armed with multiple weapons, making the notion that STEPHEN, 60 years old and 160 pounds could be a physical threat to *anyone* inside the condo was absurd.

42. Also proving that STEPHEN never threatened anyone before the officers arrived (see Police Webcam Video 1 of 5, total time 2 minutes and 22 seconds long) is the fact that when Officer Aspuru first entered the condo, the Vitas employees and Officer Aspuru all acknowledged they had no idea know who called the police to the condo, then Aspuru said that maybe it was STEPHEN, which was true.

43. When OFFICER ASPURU entered the condo, the employees inside also kept making fun of STEPHEN and laughed at him (see Police Webcam Video 1 of 5 at 0:55) as Nurse Morales shared a laugh with Officer Aspuru, saying *"He (STEPHEN) is not right"* (in the head) and at 1:24 Nurse's Aide Burgess laughingly asks ASPURU *"Can you take him (STEPHEN) from me?"*, but never once do any the Vitas employees workers or Nanny Hylton ever say they are afraid of STEPHEN or that STEPHEN made any threats.

44. Further proving that STEPHEN would never become violent with the Vitas employees is seen on Police Video Webcam 2 of 5 at 2:36, when OFFICER ASPURU came to the scene before SARGENT CATALANO arrived.

45. When ASPURU first arrived at the scene, he immediately took Vitas' side again STEPHEN, believing Vitas' false claims that STEPHEN was not on any of the legal documents, and therefore had no right to be on the property to see his parents. As

mentioned above, Officer Aspuru (just like the VITAS employees) could have also easily found out who was telling the truth by calling Vitas headquarters, where they would have also been told that STEPHEN was indeed on all the legal documents.

46. After initially refusing STEPHEN'S request to bring out Nurse Morales to speak with him,, Officer Aspuru and Vitas Chaplain Winston Chuchu finally came out of the condo with Nurse Morales for a few minutes.  On Police Webcam Video 2 of 5, from 2:36 until the end, you will see that STEPHEN was extremely polite, soft spoken and a total gentleman with Nurse Morales.  Even as Nurse Morales continued to dodge STEPHEN'S questions regarding how and why his father died, STEPHEN did not for one second raise his voice to her, let alone become violent.

47. Finally, at 4:08 of Police Webcam Video 2), Nurse Morales is seen on the video (not seen by STEPHEN at the time since his head was turned to the nurse) secretly mouthing to Officer Aspuru  that she didn't want to speak to STEPHEN anymore (so she could also avoid having to answer any more questions from STEPHEN), leading Officer Aspuru to rudely and abruptly end STEPHEN's conversation with Nurse Morales by announcing that he is "terminating" STEPHEN'S conversation with Nurse Morales, saying at 4:30 on Police Webcam Video 2 of 5 at , *"We're done, we're coming in to prevent dealing with him,"* as he turned off his webcam.

48. As can be seen clearly in this video, STEPHEN never did anything to deserve having to not be *"dealt with."* All he was doing was repeatedly asking Nurse Morales to explain how his father died, and explain her contradictions and lies.

49. STEPHEN had the legal right to ask her those legitimate questions, but Officer Aspuru took away STEPHEN'S legitimate right to ask questions to a person who was in effect her employer.  Officer ASPURU also had no right to turn off his webcam at that moment since it was one of the tensest moments that day.

50. While never raising his voice to Nurse Morales, STEPHEN did indeed raise his voice to both men (Officer Aspuru  and Chaplain  Chuchu), since (as seen throughout Police Webcam Video 2 of 5), Officer Aspuru and Chaplain Chuchu continued to interrupt and bully STEPHEN as he was trying to find out from Nurse Morales how and why his father died.

51. However, as can be seen on this video, STEPHEN never made any threats against either Officer Aspuru or Chaplain Chuchu, and never even walked towards them despite their bullying of STEPHEN.  This further reinforces the fact that STEPHEN was not a "threat" to anyone at the scene.

52. Just as Officer Aspuru did impede STEPHEN'S attempts to speak with Nurse Morales again (after she went back into the condo) , so did SARGENT CATALNAO impede STEPHEN'S attempts to speak with her or anyone else in the condo. On Police Webcam Video 4 of 5, at 1:00, SARGENT CATALANO told Nurse Morales and those inside the condo not to speak with STEPHEN, telling her not to *"entertain anything he (STEPHEN) has to say"* and to "ignore" him.

53. Regarding SARGENT CATALANO'S claim that STEPHEN made threats of using a baseball bat towards Officer Aspuru, Nanny Hylton also made this vicious claim against STEPHEN.  SARGENT CATALANO repeated this lie on Police Video Webcam 3 of 5 at 0:35.

54. If it were true that STEPHEN ever threatened *anyone* with a baseball bat, both officers would have certainly arrested STEPHEN (since it's obvious on the webcams that they were looking for any pretense to do so), or they would have at least frisked STEPHEN for weapons, which neither officer ever did.  And as mentioned above, not once in all the police videos is STEPHEN ever seen threatening anyone.

55. Finally, the worst example both officers' behavior can be clearly seen in the simplest way by going to the very last moment on all the videos, Police Video Webcam 5 of 5 at 7:50. On the video SARGENT CATALANO and Officer Aspuru are both seen together near their police car as STEPHEN finally exited the premises for fear of being arrested.

56. At that moment we can hear one of the officers laughing hysterically at STEPHEN, saying *"What's he (STEPHEN) gonna do?"* as he continued to laugh with glee, *truly enjoying STEPHEN'S anguish.*

57. Once again, all of SARGENT CATALANO's actions clearly met the definition of denying STEPHEN his civil rights under U.S.C 1983, including *"deprivation of Plaintiff's civil rights, privileges, or immunities secured by the Constitution and federal laws,"* and also acted *"under color of any statute, ordinance, regulation, custom or usage of any state or Territory or the District of Columbia"*

58. Not only did SARGENT CATALANO break the law by tampering or hiding the legal documents that would have helped STEPHEN, the officers again corruptly broke the law in their "Incident Report" (see Exhibit 6) with so many provable lies as seen below, including his claim that the officers gave STEPHEN "counselling."

59. (Yes Officer Aspuru wrote the report and is now deceased, but his "Incident Report" still had to be cleared with SARGENT CATALANO since CATALANO was Aspuru's superior officer and therefore shares responsibility for this phony "Incident Report.)"

60. See Police Report (see Exhibit 6) from the Broward Sheriff's Office.  "Filing a False Police Report" is also a crime, a Class 1 misdemeanor.  First of all, his report stated that the police were called to the scene to "investigate" Hyman's death.

61. This is another lie, since, as mentioned above, there was no "*investigation*" because it was STEPHEN who called the officers to the scene to be let into the condo.  Also, as mentioned above, on Police Webcam Video 1, at 0:55 of 2:22, when Officer Aspuru first entered the condo, the Vitas employees and Officer Aspuru all acknowledged they had no idea do not know who called the police to the condo, followed by Officer Aspuru saying that maybe it was STEPHEN, which was correct.

62. Yet in the police report, it says, "*On August 30, 2017, at 12:41 hours, I responded to an Attended Hospital Death by VITAS at 9587 Weldon Circle*" which was not true since VITAS had made no such request to the police; only STEPHEN did.

63. Below are parts of the Incident Report in italics (including spelling and grammatical errors by the officers), and STEPHEN'S responses in regular font.

64. The Most Outrageous Lie:  Claiming in the last paragraph of the report (as mentioned above) that the officers (which means both he and SARGENT CATALANO) gave STEPHEN repeated "counselling."  If you look through every second of all the videos, you will see that there is not one second of "counseling", and not even one "*I'm sorry for your loss*" by either officer.

65. That is unless the officers actually considered their non-stop threats against STEPHEN, and their bullying and belligerent behavior towards STEPHEN to be "Counselling."

66. More from the police report: "*Note that upon arrival to the scene I also made contact with Stephen marks outside in the parking lot. It quickly became apparent that despite being distraught over his dad's passing, he was very irate and hostile towards myself and in particular, vitas staff on scene the staff included Chaplain Wilson ChuChu nurse aide Dorothy Hylton and nurse aide Joan Burgess They all conveyed similar accounts to me that Stephen was threatening them and they were afraid.*"

67. Not only is this a lie that anyone was afraid of STEPHEN,, but what is conveniently omitted is why STEPHEN was irate; that is was because he was denied his legal right to have entrance into the condo to see his parents. The report never mentions this and makes it seem as if STEPHEN was upset at Vitas and the officers for no reason.

68. Back to the police report: "*They also said his brother Larry Marks kas actual Power of Attorney overseeing his father Hyman and his wife who was present also, but very ill with advanced dementia. Vitas staff has been caring for the elderly couple around-the-clock and according to them, Stephen was not allowed inside the apartment due to previous incidences*".

69. Again claiming that STEPHEN'S brother Lawrence had POA and not STEPHEN was incorrect. Also claiming STEPHEN was not allowed inside the apartment due to "previous incidents" is another vicious lie.  What previous incidents? The report doesn't say, since there weren't any.

70. Yet more from the police report: "*Stephen was a constant burden and hindrance to this investigation the entire time and scene. Despite repeated warnings and counseling he continuously displayed erratic and hostile behavior towards Vitas staff myself and sergeant Catalano on scene. He willingly left just prior to the funeral home's arrival on scene and no force or other actions were required despite his not still behavior*"

71. Just as Officer Aspuru was lying about there being any "investigation" (as mentioned above, SARGENT CATALANO also makes the false claim that there was an "investigation" when he told STEPHEN (See Video 5 of 5 at 2:48): "*I'm asking you to leave: "You're impeding in our investigation*"

72. All of this proves that SARGENT CATALANO guilty of denying Stephen Marks' civil rights under U.S.C 1983, including "*deprivation of Plaintiff's civil rights, privileges, or immunities secured by the Constitution and federal laws,*" and also acted "*under color of any statute, ordinance, regulation, custom or usage of any state or Territory or the District of Columbia*" and also acted "*under color of state and local law.*"

73. Finally, the claim that STEPHEN was threatening to use a baseball bat, was a result from STEPHEN when he first arrived at the condo before things got out of hand. After arriving, STEPHEN calmly knocked on the door several times and asked for the nurse on duty (who later turned out to be Nurse Morales) to please come outside and talk to him to explain how and why his father died. STEPHEN wanted the nurse for come outside because the door was locked and STEPHEN did not have a key.

74. STEPHEN also wanted the nurse to come outside to speak with him (as opposed to STEPHEN coming inside) because STEPHEN suffers from cold-induced asthma and the air conditioning was dirty in the condo. As mentioned above, STEPHEN lived with his parents in that condo for over a year when his mother Helen first became

stricken with Alzheimer's, but then moved out to an apartment close by because of the dirty air conditioning.

75. STEPHEN was hoping to have a civil conversation with the Nurse Morales outside regarding how his father died, including asking her to explain why he was told the night before by Vitas Nurse's Aide Burgess that his father's ailment was minor and that Hyman didn't need to be taken to the ER.

76. STEPHEN thought he would have this conversation with Nurse Morales and would then wait outside for the funeral home to arrive so he could say goodbye to his father. However, no one would open the locked door. STEPHEN had no idea that they were not going to let him inside the condo.

77. When STEPHEN'S knocks on the door went unanswered, STEPHEN simply believed that those inside were being tardy in coming to the door. Then STEPHEN heard voices inside right on the other side of the door, so he knew they could hear him too. So STEPHEN said jokingly to those inside "Please, don't make me have to come back with a baseball bat to knock down the door." Anyone seeing or hearing STEPHEN at that time (including all those inside the condo) would see that STEPHEN was joking, believing those inside were merely being tardy in opening the door.

78. However, that did not happen as those inside simply continued to refuse to open the door When STEPHEN finally realized that he was not going to be let in (although not yet knowing why), he continued to knock on the door, but this time also demanded to be let inside, no longer caring about the air conditioning, but to no avail.

79. STEPHEN was even more shocked after seeing the police video webcams to see and hear Nanny Hylton claiming another vicious lie (see Police Webcam Video 3 of 5 at 13:16) that STEPHEN wanted to "*come after her*" with a baseball bat. As mentioned above, this was the same lie made by Officer Aspuru and later SARGENT CATALANO. As also mentioned above, on all of the police videos we can see that STEPHEN never made this threat (or any threat) to anyone.

80. Especially shocking to STEPHEN is that despite some disagreements with Nanny Hylton in the past, STEPHEN still considered her a friend; seeing her almost every day for several years when he was either visiting his parents, living with them, or going out to eat with them.

81. It would appear that the only reason why Nanny Hylton would say such a thing (which as a result again led to STEPHEN not being allowed into the condo) was because, just like Nurse Morales, and Nurse's Aide Burgess, Nanny Hylton also did not

want to answer STEPHEN'S question as to why she also told STEPHEN the night before that Hyman was fine and didn't need to be taken to the ER.

82. In closing, making matters worse for STEPHEN during the filing of this lawsuit, STEPHEN has had to repeatedly re-live those moments on the police videos, repeatedly seeing the abuse inflicted by SARGENT CATALANO upon STEPHEN, and being forced to repeatedly see his father's dead body on these videos, the body he was not allowed to see on the day in question.

83. (On Police Webcam Video 4 of 5, STEPHEN edited out the parts that showed Hyman's dead body, since he doesn't want that to be part of the public record, but anyone in this case wants to see the unedited video, STEPHEN will provide that as long as it is kept private.)

84. As a result of how the events of this day have affected STEPHEN emotionally, after this incident, STEPHEN has to been taking drugs he never took before for depression and anxiety, including Seroquel and Paxil.

85. Seeing his father looking like he does in Police Video Webcam 4 of 5 after his death has been one of the most painful events in STEPHEN'S life, and still is three years after the fact.

## COUNT 1: VIOATION OF CIVIL RIGHTS UNDER 42 U.S.C 1983

1. SARGENT CATALANO was clearly guilty of the *"deprivation of Plaintiff's civil rights, privileges, or immunities secured by the Constitution and federal laws,"* and also acted *"under color of any statute, ordinance, regulation, custom or usage of any state or Territory or the District of Columbia"* and also acted *"under color of state and local law."*

2. SARGENT CATALANO violated STEPHEN'S civil rights after he told STEPHEN that he would be allowed into the condo if SARGENT CATALANO could see documentation that STEPHEN was on the legal papers for the condo.  Instead, when SARGENT CATALANO found the legal document (see again Police Webcam Video #4 of 5, from 11:00 to 12:35) as well as Exhibit 5, a still shot from that part of the video showing SARGENT CATALANO looking directly at the specific page of the Family Trust showing STEPHEN'S name in huge letters as becoming a trustee upon his father's Hyman's death, he nonetheless continued to not allow STEPHEN into the condo to say goodbye to his father and make sure that his mother (suffering with Alzheimer's) was okay.

3. As mentioned above, SARGENT CATALONO is clearly seen on the video tampering with evidence (a Class 3 Felony) in order to not let STEPHEN exercise his legal rights to see his parents and enter the condo that day; and to cause STEPHEN to leave the premises he was legally permitted to be for fear of being arrested.

4. SARGENT CATALANO also committed a Class 3 Misdemeanor by agreeing with the "Incident Report" mentioned above filled with so many provable lies, including the claim that the officers' gave STEPHEN "counselling."

Plaintiff requests a jury trial.

# EXHIBIT 1
## 2 pages



## DURABLE POWER OF ATTORNEY

I, Hyman Marks, with an address of 9587 Weldon Circle, Tamarac, Fl. 33321, make, constitute and nominate my sons Stephen Marks and Lawrence Bruce Marks as my agents. *Either of my agents shall have the full authority to act on my behalf without the consent or joinder of the other.*

In the event that either of my Co-Agents is unable or unwilling to serve, the remaining agent shall have all of the authority given hereunder below.

## ARTICLE I

I hereby give and grant unto my said Co-agents full power and authority to act for me in any lawful way with respect to the powers enumerated in Article II, and to the powers which I have separately enumerated and initialed in Article III.

## ARTICLE II

My agent is authorized to act for me in my name, place and stead and may exercise any or all of the powers contained in this Article II.

**2.1     Banking and Other Financial Institution Transactions.** With regard to banking and other financial institution transactions, my agent shall have the authority to conduct banking transactions as provided in section 709.2208(1), Florida Statutes.

**2.2     Investment Transactions.** With regard to stock and bond transactions, my agent shall have the authority to conduct investment transactions as provided in section 709.2208(2), Florida Statutes.

**2.3     Real Property Transactions.** With regard to real property transactions, my agent may exercise all of the following powers with regard to any real property I own, specifically including, but not limited to, my homestead property, leaseholds, mortgages, contracts, and mineral rights: (1) convey or mortgage real property; (2) accept as a gift or as security for a loan or reject, demand, buy, lease, receive, or otherwise acquire an interest in real property or a right incident to real property; (3) sell, exchange, convey with or without covenants, quitclaim, release, surrender, mortgage, encumber, partition, consent to partitioning, subdivide, apply for zoning, rezoning, or other governmental permits, plat or consent to platting, develop, grant options concerning, lease or sublet, or otherwise dispose of an estate or interest in real property or a right incident to real property; (4) release, assign, satisfy, and enforce by litigation, action, or otherwise a mortgage, deed of trust, encumbrance, lien, or other claim to real property that exists or is claimed to exist; (5) do any act of management or of conservation with respect to an interest in real property, or a right incident to real property, owned or claimed to be owned by me, including power to insure against a casualty, liability, or loss; obtain or regain possession or protect the interest or right by litigation, action, or otherwise; pay,

Page 1 of 12

years following that tax year; (2) pay taxes due, collect refunds, post bonds, receive confidential information, and contest deficiencies determined by the Internal Revenue Service or other taxing authority; (3) exercise any election available to me under federal, state, local, or foreign tax law; (4) act for me in all tax matters for all periods before the Internal Revenue Service and any other taxing authority; and (5) represent me, and appoint an agent or agents to represent me, before the Internal Revenue Service or any State or other taxing authority by completing, signing, and submitting IRS Form 2848 or any other governmental form.

    **1.13**   **Existing and Foreign Interests.** The powers described in Article II of this durable power of attorney may be exercised equally with respect to an interest I have at the time this durable power of attorney is executed or an interest which I acquire later, whether or not the interest is located in Florida and whether or not the powers are exercised or the durable power of attorney is executed in Florida.

    **1.14**   **Health Records and Information.** With regard to obtaining records related to my health, my agent has the authority to:

(1)   Request, review, and receive any information, verbal or written, regarding my physical or mental health, including medical and hospital records.

(2)   Execute on my behalf any documents that may be required in order to obtain this information.

(3)   Consent to the disclosure of this information.

This release authority applies to any information governed by the Health Insurance Portability and Accountability Act of 1996 (a/k/a HIPAA), 42 USC 1320d and 45 CFR 160-164. I authorize any physician, health-care professional, dentist, health plan, hospital, clinic, laboratory, pharmacy or other covered health care provider, any insurance company and the Medical Information Bureau Inc. or other health-care clearinghouse that has provided treatment or services to me, or that has paid for or is seeking payment from me for such services, to give, disclose and release to my agent, without restriction, all of my individually-identifiable health information and medical records regarding any past, present or future medical or mental health condition, including all information relating to the diagnosis and treatment of HIV/AIDS, sexually-transmitted diseases, mental illness, and drug or alcohol abuse. The authority given my agents shall supersede any prior agreement that I may have made with my health-care providers to restrict access to or disclosure of my individually-identifiable health information. The authority given my agent has no expiration date and shall expire only in the event that I revoke the authority in writing and deliver it to my health-care provider.

    **2.15**   **Provide for My Care.** With regard to health care decisions, my agent shall have the authority to make any and all health care decisions on my behalf, including but not limited to those provided for in Florida Statutes Chapter 765. *If I have executed a separate health care advance directive designation and health care surrogate pursuant to Chapter 765 of the Florida Statutes, the terms of the directive will control if its terms are in conflict with the terms of this document.*

# EXHIBIT 2

## 2 pages

### DURABLE POWER OF ATTORNEY

I, **HELEN MARKS** , with an address of 9587 Weldon Circle, Tamarac, Fl. 33321, make, constitute and nominate my sons Stephen Marks and Lawrence Bruce Marks as my agents.

*Either of my agents shall have the full authority to act on my behalf without the consent or joinder of the other.*

In the event that either of my Co-Agents is unable or unwilling to serve, the remaining agent shall have all of the authority given hereunder below.

### ARTICLE I

I hereby give and grant unto my said Co-agents full power and authority to act for me in any lawful way with respect to the powers enumerated in Article II, and to the powers which I have separately enumerated and initialed in Article III.

### ARTICLE II

My agent is authorized to act for me in my name, place and stead and may exercise any or all of the powers contained in this Article II.

**2.1**   **Banking and Other Financial Institution Transactions.**   With regard to banking and other financial institution transactions, my agent shall have the authority to conduct banking transactions as provided in section 709.2208(1), Florida Statutes.

**2.2**   **Investment Transactions.**  With regard to stock and bond transactions, my agent shall have the authority to conduct investment transactions as provided in section 709.2208(2), Florida Statutes.

**2.3**   **Real Property Transactions.**  With regard to real property transactions, my agent may exercise all of the following powers with regard to any real property I own, specifically including, but not limited to, my homestead property, leaseholds, mortgages, contracts, and mineral rights: (1) convey or mortgage real property; (2) accept as a gift or as security for a loan or reject, demand, buy, lease, receive, or otherwise acquire an interest in real property or a right incident to real property; (3) sell, exchange, convey with or without covenants, quitclaim, release, surrender, mortgage, encumber, partition, consent to partitioning, subdivide, apply for zoning, rezoning, or other governmental permits, plat or consent to platting, develop, grant options concerning, lease or sublet, or otherwise dispose of an estate or interest in real property or a right incident to real property; (4) release, assign, satisfy, and enforce by litigation, action, or otherwise a mortgage, deed of trust, encumbrance, lien, or other claim to real property that exists or is claimed to exist; (5) do any act of management or of conservation with respect to an interest in real property, or a right incident to real property, owned or claimed to be owned by me, including power to insure against a casualty, liability, or loss; obtain or regain possession or protect the interest or right by litigation, action, or otherwise; pay, compromise, or contest taxes or assessments or apply for and receive refunds in connection with them; and purchase supplies, hire assistance or labor, or make repairs or alterations in the real

Page 1 of 12

authority, given my agent has no expiration date and shall expire only in the event that I revoke the authority in writing and deliver it to my health-care provider.

**2.15    Provide for My Care.** With regard to health care decisions, my agent shall have the authority to make any and all health care decisions on my behalf, including but not limited to those provided for in Florida Statutes Chapter 765. *If I have executed a separate health care advance directive designation and health care surrogate pursuant to Chapter 765 of the Florida Statutes, the terms of the directive will control if its terms are in conflict with the terms of this document.*

## ARTICLE III

My agent is authorized to perform the following specific acts for me:

**Initial:**

YES (_____)    **Power to Enter Safe Deposit Box.** I grant to my agent the power to enter my
NO(_____)    safe deposit box.

YES(_____)    **Power to Make Gifts to Descendants Under the Annual Exclusion.** I grant to
NO (_____)    my agent the power to make gifts of any of my property to or to pay amounts on behalf of (including transfers which are made outright, in trust or otherwise) any one or more of my descendants (including my agent, if my agent is a descendant of mine) or to any charitable organization to which deductible gifts may be made under the income and gift tax provisions of the Code. Such gifts or amounts paid to my descendants may not exceed those which are excludible under Section 2503(b) or Section 2503(c) of the Code or those to which the split gift provisions of Section 2513 of the Code are expected to apply. (OR, SUCH GIFTS OR AMOUNTS PAID TO MY DESCENDANTS SHALL INCLUDE, AND MAY EXCEED, THOSE WHICH ARE EXCLUDIBLE UNDER SECTION 2503(B) OR SECTION 2503(E) OF THE CODE OR THOSE TO WHICH THE SPLIT GIFT PROVISIONS OF SECTION 2513 OF THE CODE ARE EXPECTED TO APPLY.) Nothing herein shall be construed to require any court action whatsoever prior to making such gifts, nor to restrict such gifts to a situation in which it must be determined that I will remain incapacitated for the remainder of my lifetime. Notwithstanding the foregoing, the gifts made by a person who is then serving as my agent under this durable power of attorney to him/herself shall either be made solely for his/her health, education, maintenance and support or shall not exceed in the aggregate for any calendar year the greater of five thousand dollars ($5,000) or five percent (5%) of the fair market value of my estate (for U.S. gift tax purposes) as of December 31st of such calendar year; provided, however, if my agent is making gifts authorized by the following paragraph of this durable power of attorney in order to obtain or maintain eligibility for public health care benefits, then these limitations shall not apply.

Page 7 of 12

# EXHIBIT 3
## 1 page

### DESIGNATION OF HEALTH CARE SURROGATE

I, **HYMAN MARKS**, a resident of Broward County, Florida, state that in the event that I am determined to be unable or incapacitated to provide informed consent for medical treatment and surgical and diagnostic procedures, I wish to designate my sons **Lawrence Bruce Marks** and **Stephen Marks** as my Co-surrogates to make health care decisions.

**I.    DESIGNATION:**

Name:    **Lawrence Bruce Marks**
Address:

Name : **Stephen Marks**
Address:

**II.    SCOPE OF SURROGATE'S AUTHORITY:** In exercising this authority my surrogate(s) shall follow my desires as set forth in this document or in a medical advance directive, or as may be otherwise known to the surrogate. I fully understand that this designation will permit my designee to exercise the following authority:

a.   To act for me and to make all health care decisions for me in matters regarding my health care during my incapacity, in accordance with my instructions, unless I have expressly limited such authority;

b.   To act for me and to make all mental health care decisions for me in matters regarding my mental health care for both in-patient hospital care and out-patient hospital care in the event I am in need of treatment and am unable to seek assistance myself due to incapacity or inability to recognize the need for treatment.

c.   To consult expeditiously with appropriate health care providers to provide informed consent, and make only health care decisions for me which he or she believes I would have made under the circumstances if I were capable of making such decisions. If there is no indication of what the principal would have chosen, the surrogate may consider the patient's best interest in deciding that proposed treatments are to be withheld or that treatments currently in effect are to be withdrawn.

d.   To provide, withhold or withdraw written consent on my behalf whenever consent or withdrawal thereof is required as it relates to medical care, treatment, surgical procedure, diagnostic procedure, medication. As to providing or withholding consent as to the use of mechanical or artificial means to replace or support a bodily function, my surrogate is to be guided by instructions in my living will and medical advance directive;

e.   To request and be provided with access to my clinical records, whether privileged or confidential, including medical and mental health records. My surrogate may execute any written release or consent that may be required in order to obtain such information;

# EXHIBIT 4
## 2 pages

THE HYMAN and HELEN MARKS REVOCABLE TRUST

DATED October 15, 2016

THE HYMAN and HELEN MARKS REVOCABLE TRUST Dated October 15, 2016. Page 5

## ARTICLE III
## ADMINISTRATION & DISTRIBUTION DURING THE LIFE OF THE GRANTORS

**(A)    ORDER OF SUCCESSION:** The Trustee of this Trust shall be **HYMAN MARKS.** If **HYMAN MARKS** cannot continue to serve due to death, resignation or incapacity, the Successor Co- Trustees shall be **LAWRENCE BRUCE MARKS  and STEPHEN MARKS.**

If either of the Successor Co-Trustees cannot serve for any reason, the remaining Co-Trustees shall continue to act and serve as successor Trustee with full authority hereunder.

If two or more Trustees are serving at any time, any power or discretion of the Trustees may be exercised only by their joint agreement.  Either Trustee may delegate to the other Trustee the authority to act on behalf of both Trustees and to exercise any power held by the Trustees.  If more than two Trustees are serving at any time, and unless unanimous agreement is specifically required by the terms of this Trust, any power or discretion of the Trustees may be exercised only by a majority.  The Trustees may delegate to any one or more of themselves the authority to act on behalf of all the Trustees and to exercise any power held by the Trustees.  Trustees who consent to the delegation of authority to other Trustees will be liable for the consequences of the actions of those other Trustees as if the consenting Trustees had joined the other Trustees in performing those actions.  A dissenting Trustee who did not consent to the delegation of authority to another Trustee and who has not joined in the exercise of a power or discretion cannot be held liable for the consequences of the exercise.  A dissenting Trustee who joins only at the direction of the majority will not be liable for the consequences of the exercise if the dissent is expressed in writing delivered to any of the other Trustees before the exercise of that power or discretion.

**(B)    TRUSTEES MAY SIGN:** During such time as the initial Trustees are acting under this Article, the Trustees alone shall have the sole power to buy, sell, hold, or transfer any asset in this Trust by executing any appropriate document, whether it be a deed, bill of sale, contract, stock or bond certificate or power, option, lease note or mortgage, or by an oral demand to buy or sell a stock or bond.  Further, the Trustees shall have the right and power to make any deposits and withdrawals from any bank, brokerage, or mutual fund account of the Trust, and any bank, broker, or mutual fund holding such account may accept the Trustee's signature on any check.

**(C)    DISPOSITION OF INCOME AND PRINCIPAL:** During the GRANTOR'S lifetime, the Trustees shall pay all of the net income of the Trust currently in convenient installments, at least annually to the GRANTORS or as the GRANTORS otherwise directs in writing and the Trustees shall, from time to time, upon written direction by the GRANTORS, pay any part or all of the principal to the GRANTORS or as the GRANTORS otherwise directs.

**(D)    USE OF TRUST ASSETS DURING DISABILITY OR INCAPACITY OF THE GRANTORS:** If at any time or times GRANTORS is under a legal disability or is unable properly to manage GRANTOR'S own affairs, Trustees may use such sums from the income and principal of

# EXHIBIT 5
**1 page**



# EXHIBIT 6

## 2 pages

### INCIDENT/INVESTIGATION REPORT

| Agency Name | | | Case# |
|---|---|---|---|
| *Broward County Sheriff's Office* | | | 07-1708-003114 |
| ORI  0063100 | | | Date  Time Reported  08/30/2017 12:43  Wed |
| | | | Last Known Secure  08/30/2017 12:43  Wed |

**INCIDENT DATA**

| Location of Incident | Premise Type | Zone/Tract | At Found  08/30/2017 12:43  Wed |
|---|---|---|---|
| *9587 Weldon Cir Apt. 104, Tamarac FL 33321-* | *Victim Single Family* | 0701 | |

| # | Crime Incident(s) | (Com) | Weapon / Tools  NOT APPLICABLE | | | Activity |
|---|---|---|---|---|---|---|
| #1 | *Death Investigation*  DEAT | | Entry | Exit | Security | |
| #2 | Crime Incident | ( ) | Weapon / Tools | | | Activity |
| | | | Entry | Exit | Security | |
| #3 | Crime Incident | ( ) | Weapon / Tools | | | Activity |
| | | | Entry | Exit | Security | |

**MO**

**VICTIM**

| # of Victims  1 | Type  INDIVIDUAL (NOT A LE OFFICER) | | Injury  None | | | | Domestic: N | |
|---|---|---|---|---|---|---|---|---|
| V1 | Victim/Business Name (Last, First, Middle)  MARKS, HYMAN | | Victim of Crime #  1. | DOB  01/18/1925  Age  92 | Race  W | Sex  M | Relationship To Offender  00 | Resident Status | Military Branch/Status |

| Home Address | | Home Phone |
|---|---|---|
| *9587 WELDON CIR - 104, Tamarac, FL 33321-* | | 954-954-9331 |

| Employer Name/Address | Business Phone | Mobile Phone |
|---|---|---|
| | | |

| VYR | Make | Model | Style | Color | License | VIN |
|---|---|---|---|---|---|---|
| | | | | | | |

**OTHERS INVOLVED**

CODES: V - Victim (Denote V2, V3)   O = Owner (if other than victim)   R = Reporting Person (if other than victim)

| Type  INDIVIDUAL (NOT A LE OFFICER) | | Injury | | | | | |
|---|---|---|---|---|---|---|---|
| Code  RP | Name (Last, First, Middle)  MORALES, ANA SILVIA | Victim of Crime # | DOB  09/10/1949  Age  67 | Race  W | Sex  F | Relationship To Offender | Resident Status | Military Branch/Status |

| Home Address | | Home Phone |
|---|---|---|
| *8135 Sunrise Lakes Blvd 102  Sunrise, FL 33322* | | |

| Employer Name/Address  *VITAS (RN)* | Business Phone | Mobile Phone  954-439-6279 |
|---|---|---|

| Type  INDIVIDUAL (NOT A LE OFFICER) | | Injury | | | | | |
|---|---|---|---|---|---|---|---|
| Code  IO | Name (Last, First, Middle)  MARKS, LARRY | Victim of Crime # | DOB  05/07/1957  Age  60 | Race  W | Sex  M | Relationship To Offender | Resident Status | Military Branch/Status |

| Home Address | | Home Phone |
|---|---|---|
| *113 Muir Ln  Chapel Hill, NC 27514* | | 919-880-4237 |

| Employer Name/Address | Business Phone | Mobile Phone  919-452-8927 |
|---|---|---|

**PROPERTY**

L = Lost   S = Stolen   R = Recovered   D = Damaged   Z = Seized   B = Burned   C = Counterfeit / Forged   F = Found  ("OJ" = Recovered for Other Jurisdiction)

| VI # | Code | Status Fms/To | Value | OJ | QTY | Property Description | Make/Model | Serial Number |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

| Officer/ID#  *ASPURU, R. F. (3420, PATR) (9239)* | | |
|---|---|---|
| Invest ID#  *BROWN, J. J. (3720) (11100)* | | Supervisor  *HUNT, L. M. (3420) (11622)* |

| Status | Complainant Signature | Case Status  *Active*  08/30/2017 | Case Disposition: | Page 1 |
|---|---|---|---|---|

## REPORTING OFFICER NARRATIVE

| *Broward County Sheriff's Office* | | | 07-1708-003114 |
|---|---|---|---|
| Victim | | Offense | Date / Time Reported |
| *MARKS, HYMAN* | | *DEATH INVESTIGATION* | *Wed 08/30/2017 12:43* |

On August 30th, 2017 at 1243 hours, I responded to an Attended Hospice Death by VITAS at 9587 Weldon Circle #104, Tamarac, Fl. On arrival I met with VITAS RN Anna Morales and observed the deceased patient Hyman Marks 1/18/25 lying unresponsive in his bed. RN Morales said Hyman had several serious medical afflictions including a recent heart condition which required a Pacemaker and he was Terminally ill. RN Morales said Hyman has a DNR on file and I saw it was posted by Dr Nierhala Rattan-Washington from VITAS. Morales stated Hyman appeared to have had a fatal medical episode sometime shortly before my arrival and RN Morales Pronounced him Deceased at 1222 hours. I made contact with VITAS Doctor Washington who was willing to sign the Death Certificate, as well as Broward Medical Examainer Dr Rangel who was informed of the death and Refused Jurisdiction. Star Of David was contacted for final arrangements and removed the body at 1534 hours, per previous arrangements made by VITAS and next of kin Larry Marks.

Note that upon arrival to the scene, I also made contact with Stephen Marks outside in the parking lot. It quickly became apparent that despite being distraught over his dad's passing, he was very irate and hostile towards myself and in particular, VITAS staff on scene. The staff included Chaplain Wilson ChuChu, Nurse Aide Dorothy Hylton and Nurse Aide Joan Burgess. They all conveyed similar accounts to me that Stephen was threatening them and they were afraid. They also said his brother Larry Marks has the actual Power Of attorney overseeing his father Hyman and his wife who was present also, but very ill with advanced Dimentia. VITAS staff has been caring for the elderly couple around the clock and according to them, Stephen is not allowed inside the apartment due to previous incidents.

Stephen was a constant burden and hindrance to this investigation the entire time on scene. Despite repeated warnings and counselling, he continuously displayed erratic and hostile behavior towards VITAS staff, myself, and Sgt Catalano on scene. He left willingly just prior to the funeral home's arrival on scene and no force or other actions were required despite his hostile behavior.